All rise. The court is now back in session. Honorable Justice Robert A. Gordon is presiding. Everyone can be seated. Case number 15-0575, Mr. Sergio Hernandez. Okay, would the lawyers please approach the bench and introduce yourself to the court. Good morning, Your Honors. Counsel, and police and court, my name is Brian Reina with the Office of the State Appellate Defender. I'm representing the appellant, Sergio Hernandez. Good morning, Your Honors. Assistant State's Attorney, Christine Cook, on behalf of the people. Okay. And you're going to reserve how much time for your rebuttal? With your permission, Your Honor, I would like to request just five minutes in rebuttal. Okay. All right, then proceed. May it please the court. Your Honors, this court previously found that police illegally arrested Sergio Hernandez, and at an attenuation hearing on remand, the state failed to meet its burden of proving that his statement, Hernandez's statement, was a product of his own free will. The evidence showed that police exploited the illegal arrest, using it as an opportunity to conduct a fishing expedition. There are four factors relevant to an attenuation analysis, and the state failed to prove that any of them weighed in its favor. First, the state failed to prove a non-voluntary Miranda waiver. There was no written waiver, no affirmative waiver, and Fernandez, the interrogating detective, admitted at the attenuation hearing that he failed to clarify Hernandez's ambiguous body language. And, in fact, the video, the full interrogation video, introduced at the attenuation hearing, shows, telling me that Hernandez expressed body language indicating uncertainty as to whether he understood his Miranda rights. And Fernandez testified that he based his testimony of a voluntary waiver on his body language. That appears about 20 minutes and 21 seconds into the video. It's a very telling action that Hernandez does. He shakes his hand and kind of wavers. It's really hard to interpret that as a knowing waiver. Let me ask you this. Is the doctrine of the law of the case applicable here? I mean, aren't we just basically reliving the same issues that were decided on the appeal? Well, Your Honor, when this case was remanded from attenuation hearing, it was done so because this court found that there was, the record was insufficient to show attenuation. And, basically, the state had another opportunity to introduce evidence to prove attenuation. And it failed to do that. There's really nothing in the record that wasn't here before. So there are no new facts. There are no new facts. The full video is now in evidence. It supports all the arguments that were raised initially on appeal and shows that the state didn't prove attenuation. If there's a new fact, anything new favors Hernandez. For instance, when it comes to interviewing circumstances, the state relied heavily only, actually, below, on a GSR test that was given toward the end of the interrogation. And what we know now about that is that everybody has admitted this was a fake test, that it was a ruse aimed at eliciting a confession. That shows- Would Bernie know that beforehand? This court in its opinion referenced the GSR test, but it never said it was fake. So we know the test was given. I don't know if it was conclusively known the test was fake, but now we do know that. And that actually also goes toward showing police misconduct as well because the state has admitted this is an interrogation technique, essentially. This is something that was done for purposes of eliciting a confession. There was no time in this interview. Did we get a confession here? I mean, didn't, after they say that, you know, yeah, we touched him up positive, didn't he say, well, yeah, I accidentally, the gun went off accidentally? He never admitted to intentionally killing him. He never admitted to committing the offense. He just said the gun accidentally went off. I had a hair trigger and the gun accidentally went off. Did we see that as a confession? Well, no, but yes, it's a confession to shooting, it's an admission to shooting the gun that caused the death. And what he's doing is adopting a story that had been told to him for six hours. Who told him that story? Hernandez. He's repeatedly suggested during this interrogation that maybe it was an accident. Maybe he didn't mean this. Maybe he just tried to scare her. And that's exactly, exactly what Hernandez said when he finally was worn down. He realized the only way he could get out of this room is to agree with the police. Let's talk about the time frame. You say six, six hours, five, five and a half hours, six hours, right? And in the interim that time, he went to the bathroom, he ate. So it wasn't a constant six hours of just peppering this gentleman with questions and putting hot lights on him, right? Well, when you talk about going to the bathroom, he was escorted by a police officer to a jail cell. It wasn't an entire six hours where he's being grilled by Hernandez in the interrogation room. There are some breaks in there where he actually is permitted to eat. He goes to the bathroom. Well, there were three breaks, about 30 minutes or so each. My position on that is that those are part of the interrogation. I mean, that is an interrogation technique that is taught to police to leave a suspect without knowledge of what's going on to increase his anxiety and uncertainty about what's happening. Hernandez didn't even know why he was at the station, despite asking officers on the way there and during the beginning of the interview, interrogation, excuse me, until 20 minutes or so into the interrogation. So they're leaving him there. They have an attenuation and are going now, also finding out that when the second vehicle shows up, the purpose of that second vehicle is because they have a Spanish-speaking officer, but that there's no conversation had between the officers and the defendant in the second vehicle as they're proceeding over to the police station. Well, Detective Moreno testified at the attenuation hearing that Hernandez asked why they were going to the station and he said he would tell them when they got there. So the state does not want to appeal that he was voluntarily at the station, but that would rebut any such argument. He didn't even know why he was going to the station. He was never told he was free to leave. But he never asked him, right? He never asked him. He was never the person in a position of having been confronted with 20 or 24 officers, 5, putting guns on him. But that was at the initial scene. We're talking about him being transferred over to the police station. But I don't think this seems to mark him being transferred. He's in a car that doesn't have a cage, and he has access to exit that vehicle if he chooses to do so, right? He did not know he could leave that vehicle if he chose to do so. That's not my question, though. It was a vehicle that allowed him to exit if he wanted to, right? The officer testified the door was unlocked and that Hernandez was never told that the door was unlocked. And certainly when he was sitting next to a police officer with a gun guarding him, he couldn't have opened the door when the car was driving and jumped out. But that's my facts here. The facts are that now we know things that we didn't know beforehand. So it's not the same set of facts, right? Because now we know more about what happened after he was escorted to the second vehicle, and now we know more what happened in the interrogation room than we did beforehand. We know a little bit more about the transfer of the second vehicle. You're correct about that. And a little bit more about the interrogation, but the full transcript and video are in the record on direct appeal. So what we don't know, because it doesn't exist, is anything that proves attenuation. There's nothing independent here outside of the illegality, the illegal arrest, that the state has proven they introduced to separate the statement from the arrest. There's absolutely nothing. All of the circumstances that the state relies on in page 32 and 33 of its brief are not independent. They came from Hernandez. They didn't induce him to confess, and some of them don't even implicate him. And they didn't even rely on those below. The state exclusively argued the GSR test below was the intervening circumstance. What's your best case that this was a seizure? Oh, that this was a seizure? Your Honor, I don't know the best case on the seizure, because we've already found that this is an illegal arrest. I think the best case is your appellate decision, finding that this arrest is illegal. And is that what we said? We said that we needed more facts to determine. More facts to determine whether the statement was attenuated, and it was specifically remanded for an attenuation hearing, where the legality of the arrest, despite the state conceivably could have brought it up, did not. I mean, the attenuation was the only thing litigated below. In regards to people versus law and law, all right, I want to talk about that a little bit, because you said that this case is similar to Longo. But actually, this is very dissimilar to Longo, because the reason that Kirby initially went over to go pick up the defendant is because the defendant indicated that he didn't have a vehicle. And that's why Kirby went over to go pick him up. And then once he approached Kirby and Kirby saw that he was handcuffed, he told them to remove the handcuffs. All right, they had supposedly pleasantries, which isn't denied. He gets into the vehicle, and then he proceeded to go on. So this case really isn't similar to Longo at all, because in Longo, you know, the gentleman didn't have a choice at all. He wasn't given an opportunity to drive his own vehicle, whether or not he had one or not. And he was forced into the vehicle where, as opposed to hearing the defendant, voluntarily goes into the vehicle. And it's clear from the first time he gets into the first vehicle, Kirby's vehicle, and then later on into the second vehicle, that he himself voluntarily enters the vehicle. Well, if I recall, Your Honor, the testimony of the officers was that they put him in the vehicle and that he was never told he was free to leave. So in that sense, and he was never asked if he wanted to arrange a different transportation or drive himself to the station. So on those facts, the cases are similar. But I think it's worth pointing out that Miranda testified at the attenuation hearing that for the first time, and he was not the officer who talked to Hernandez in Spanish, that was Officer Lopez, that Hernandez said he didn't have a car and wanted to be picked up. If you watch this interrogation video, it shows that that is a lie. What's a lie? That Hernandez didn't have a car. One of the first things he tells police is that his truck was at his house. So his truck was there the whole time. He could have driven himself to the station from the get-go if he was ever given that choice. And then the police searched the truck. I mean, that is what a fishing expedition is. They're exploiting this arrest from the get-go. Well, then why wasn't that raised at the trial and at the attenuation hearing? Because we know at both that Kirby goes over to pick him up. There's no doubt about that. That's correct. And also the fact that he didn't have a vehicle. So if he has a vehicle and he wants to use his vehicle to go to the police station, why wasn't that issue raised? We're going to have to argue on draft appeal and draft appeal from the attenuation hearing that counsel is ineffective. Also, the fact that Hernandez supposedly said he didn't have a car didn't come out until the attenuation hearing. At the motion and the trial, López, who actually talked to Hernandez in Spanish, testified, and he never said that Hernandez asked him to pick him up or that he said he didn't have a car. He said he asked to come to his house to talk to him, that Hernandez called and said, Hey, are you looking for me? Here's where I live. You can come talk to me. This whole idea that he didn't have a car and asked the officers for a ride is new. It's new from Detective Miranda, and part of why counsel is ineffective, in my view, was because she could have called López or introduced his prior statements to impeach that testimony. In some manner, the state failed to meet its burden. It was the state's burden to approve attenuation, and there are no factors favoring that. I would ask the university trial court's finding of attenuation and remand for further proceedings. Thank you. May it please the court, counsel, Christine Cook, on behalf of the people, there is a lot of things that are new before this court today that you didn't know the first time we were up here. And in fact, in your written opinion, when you sent this case back for an attenuation hearing, this court listed the laundry list of facts that they wanted to know that wasn't in this record. And I'd like to review those now. I've got 15 of those of what's new. The conversation between defendant and López in the car. It was testified at the attenuation hearing that only the directions to the defendant's apartment were the conversation between defendant and López. López never spoke to the defendant after he had arrived at the defendant's apartment and was not in any of the transportation cars and had no activity in the interview process of the defendant. That's new. The conversation with the defendant in the car. There was none other than when the defendant got into Detective Fernandez's car, he asked why he was going to the police station. And as counsel noted, the defendant was told, we'll talk about it when we get to the police station. That's new. The circumstances and reason for the transfer of the car. That's new evidence solicited at the attenuation hearing. And as Justice Gordon noted, the reason for that was because Detective Kirby and the other detective in his car did not speak Spanish and had no involvement in the murder investigation. Was the defendant asked or told to go to the police station? That's new evidence solicited at the attenuation hearing. He was asked and the defendant repeatedly said, yes, I will go with you. And at all times he was always introduced to the officers and the detectives involved, shaking hands and so forth. The next question this court wanted to know, did the defendant voluntarily get into Officer Kirby's car? Yes, I'll go with you. That's new evidence. Was the defendant given the option of driving himself? As this court has previously noted, the defendant told Detective or Officer Kirby, come and get me, I need a ride, I don't have a car. And then this evidence also shows that Officer Lopez was in constant phone contact with the defendant because they didn't know where he lived and had a great deal of trouble finding the location of the defendant's apartment. Counsel now suggests that maybe the officers lied about that, but of course that's refuted by the record, is a brand new allegation made for the first time in oral argument today and is wholly improper. Next, did Officer Lopez want to speak to the defendant at his apartment or at the police station? Police station. Were the doors to Detective Fernandez's car unlocked and uncaged? Both. The car was unmarked, the car was uncaged, the doors were unlocked. The next thing this court wanted to know that was elicited at the attenuation hearing. Was the defendant alone in the backseat of Detective Fernandez's car? No. Detective Miranda's was with him. What was the time, the duration, and the mood of the encounter at the defendant's apartment? Judge Farquharada found that that interaction was short, cordial, polite, and pleasant. The only question this court asked on the first appeal was what the subjective belief of the defendant was. That is the only question that I cannot answer because the defendant has never testified to any of this. So let me ask you then, does the doctrine of the law of the case apply here or does it not? Sure. Why does it apply? Well, this court has already found that when it sent the case back for an attenuation hearing that the seizure at the defendant's apartment was in effect an arrest, which is why it was sent back for an attenuation hearing. There were insufficient facts to determine whether or not the defendant was technically under arrest. And by sending it back for an attenuation hearing, this court was implicitly stating that they had no alternative but to send it back for an attenuation hearing because it could not determine what the facts were of the case because there weren't enough facts elicited. So are we mitigating the same issues? Not at all. No. The only issue this court has to decide is whether or not the people established their burden of establishing the attenuation factors. And those factors are clearly established. The existence of Miranda rights. Well, the defendant would like this court to believe that there was no affirmative waiver of the Miranda rights. I would like to refer this court to People's Exhibit No. 61, the transcript of the video interview of Sergio Hernandez. And as Detective Fernandez is reading those rights, you have a right to remain silent, you don't have to speak with me if you don't want to. Do you understand that? Mm-hmm. Okay. Anything you say can be used against you in a court. Do you understand that? Mm-hmm. Well, what about that issue that he responds to when his rights are right to him but he's only nodding his head and he's also verbally indicating by going, Mm-hmm. Let me finish. In a court of law, you have the right to speak with a lawyer and to have him present while you are interrogated. Mm-hmm. If you cannot pay for a lawyer, one will be appointed for you to represent you before being interrogated if you wish. Mm-hmm. Do you understand that? Yes. Okay. Clearly, the defendant has affirmatively waived his Miranda rights. And even aside from the video of this, Detective Fernandez testified at the attenuation hearing that the defendant affirmatively waived his Miranda rights. And when you view the video in context, it is clear that the defendant knowingly waived his Miranda rights. This is the defendant who challenged the police when they asked to search his truck. He originally said no. What does that mean? And the officer said, if you don't want us to search the truck, the truck does not get searched. And the defendant refused to have his truck searched. The officers ultimately got a search warrant through the uncle, who I believe was the original owner, although the truck was registered or maybe he was a co-owner, but they originally got a search warrant anyway. But this defendant was in no fear, was not intimidated by the situation at all. He also refused initially for the gunshot residue test. Initially he said, bring it on, bring it on, all the false revival of this defendant. Who's offering up a potential defendant who really may have killed his former girlfriend. This man is manipulating the situation in order to get off the proverbial radar of the police. He's not afraid, he's not intimidated, he's sitting back in that chair confident as all get out. I can talk my way out of this. His body language and the tone of this interview is unbelievably benign. It's almost dull. This record clearly shows the defendant waived his Miranda rights. There was no lack of understanding whatsoever. There was no lack of time period of interrogation. Counsel argued that for six hours the defendant was badgered and made to basically parody what the officer told him to say. Completely untrue. Let's break down the interview. He was not interrogated for six hours. There were three separate interviews of this defendant. And again, viewing the video, it's incredibly benign. It's monotone the entire time. Interview number one starts at 9.31 p.m. The officers introduce themselves and they're trying to establish what the relationship is with the defendant and the victim. Detective Fernandez even testifies at the attenuation hearing that the defendant was not a suspect when they first started questioning him. And in fact, Detective Fernandez testifies that they had the victim's present boyfriend in that same video room for hours questioning him. That they had the victim's brothers in, all of her friends. They're just trying to figure out how this young woman gets executed in a parking lot as somebody drilling a bullet through her head. And they've got, right now, not too many leads. They're just trying to get their way of the land. And the defendant pops up on the radar screen as a recent breakup. So they naturally want to know, is there anything we need to know? And the defendant offers up a stranger. Well, she was at these dances and there was this man following her and stalking her. And somehow he knew all about me. And that made me nervous, so I was distancing myself from her. And, you know, ever since I had taken her to an abortion clinic a few weeks ago, I had no contact with her. Which then leads us into intervening circumstances. They cited People v. Hughes as a basis as to why they should prevail subsequent to the attenuation hearing in this appeal. People v. Hughes is the case where, you know, the defendant is badgered. It was issued by this court in response to that. Oh, there is no badgering of this defendant whatsoever. Again, I would challenge this court to look at this video and find a more benign tone than you would find in this case. It's almost shocking as to how benign and monotone the whole thing is. And, in fact, Judge Fekirada commented on the tone. He said cordial I don't know how many times in all of his findings of all of these attenuations. In the first interview, again, the police are just kind of trying to get the lay of the land. Maybe he knows something, maybe he can bring us to a lead. We already know that they had already talked to the present boyfriend and the two brothers and another one of the victim's friends. So this is not a fishing expedition contrary to what counsel had. They established at the first interview that the defendant says I haven't had any phone contact with her since the abortion several weeks ago. And there's a couple of intervening factors in the first interview. Now, down below, it was only the trial judge only found one intervening factor, that being the gunshot residue. But this court, of course, can look at this whole record and should do so because there are intervening factors all over this place. Specifically in interview number one, Detective Fernandez tells the defendant I know that your former girlfriend, the victim, has been with this other man for two to three years, that they talked about marriage, and that the victim's brothers even knew that she had been unfaithful to you for many years. That's an intervening circumstance. And the police also tell the defendant her friend came in. We've already talked to her, and the victim told her friend that she had risked her life by aborting your child a few weeks ago. Of course, the defendant denies a prior domestic violence where he had grabbed her hair and locked her in the apartment. The police also then confront him about the prior domestic, which could also be deemed a proper intervening circumstance. And that's when the police first ask about the truck search, and the defendant refuses. What about the GSR? The GSR doesn't happen until very late in interview number three. I'd like to, if I can, interrupt for just a second and talk about interview number two. There's a 35-minute break. The first interview starts at 9.30 and ends about 11 o'clock, so it's only 90 minutes. Also keep in mind, Detective Fernandez is present for every single minute of every single interview the defendant had. When the defendant was first brought into that interview room, he immediately falls asleep underneath the table until the detectives come in and wake him up. During the first 35-minute break, he was allowed to use the bathroom. He again nods off. He starts going through his wallet, clearly not a sign that he's intimidated or distressed or being exploited from an illegal arrest. And then during interview number two, which started around 11.05 p.m., the police officers begin to commit the defendant to his alibi and want to start nailing down some more details. And again, now the record doesn't explicitly say this, but it appears as though this is when they're starting to think maybe he could be a suspect. He starts talking about Christmas lights and his landlord and his roommates. Then again, we went to the GSR. Right. Well, in interview number two, that is when they find a holster. He's confronted with the holster found in his truck, also another intervening circumstance, as well as being confronted with the defendant's threat to the victim to be careful the last time they spoke. Another 35-minute break is taken where the defendant's tying his shoes and he's got his head in his hands. And then during interview number three, which starts around 2.10 in the morning, he's again now confronted with the inconsistencies and the refutation of his alibi, specifically that neither of his roommates are backing him up regarding him leaving the apartment at 9 o'clock and the fact that they said not only did he leave much earlier, but he was wearing a black hoodie, the same color, same sweatshirt worn by the shooter. He was confronted with the alibi being broken by the two roommates, with the victim's boyfriend who identified him in a lineup, a receipt from Carcinera El Paso at 6.14, and then the GSR test. So now that he's being confronted with this avalanche of intervening circumstances, the defendant is now backed into a corner. This is his last shot of trying to get away with it, trying to talk his way out of what's going on, the last thing that happens. The issue that they're raising is that since this was really false information in terms that it wasn't a positive test, right? Right, it's a fake test. So that is, in a sense, a method of badgering the defendant into confessing. Absolutely not. To address that issue. Now, legally, we have cited Mueller, Collins, Cashman, Martin, and Torrey. Legally, the police are allowed to do this. And factually, this case shows that the defendant welcomed that test. Bring it. I will do it. Bring it. Let's do it now. All of the bravado. This is not a defendant being badgered. This is a defendant presenting his bravado to the police. I will get out of this. I will walk out of here. I will prove to you. This couldn't be more clear that this is not an exploitation of the arrest. This is a defendant finally confessing after being confronted with a literal battle lance of evidence that his alibi was a lie. This is not an exploitation. There are several intervening circumstances, and the gunshot residue, whether it's real or fake, was no exploitation. It was just the last thing, and when he realized he couldn't muster that, he confessed. How is this different from a polygraph test? Well, a polygraph test, first of all, results are, I mean, granted that this is a fake test, but a GSR test in and of itself is not inadmissible. It's admissible evidence. It's not a form of interrogation. It does not speak for itself as to who committed a crime like an assessment of matter like a polygraph test would. It is an extrinsic piece of evidence which would lead one to believe that maybe somebody was firing a gun, or has been in the proximity of firing a gun, but it's certainly nothing like a polygraph test at all. It certainly wasn't made as a fishing expedition at all either. It was merely to facilitate the end of this interview where the defendant is realizing he can't talk his way out of this any longer. So it's not really analogous to a polygraph test at all, because it's not substantive in its nature the way a polygraph test is. One of the most important factors in an attenuation hearing, of course, is the purpose and the flagrancy of police misconduct, And there is absolutely no evidence in this record based on not just the trial court's ruling, which is corroborated by Detective Fernandez and everybody else's testimony, but by the video itself. And there is absolutely no misconduct. These police officers should be applauded for their behavior, not criticized. This was the opposite of a fishing expedition. I have listed in great detail on page 33 of our brief all of the facts that the police did know before they interviewed the defendant. That they had, that the victim had lied, had been with other men, she had had an abortion, had recently aborted the defendant's child. They knew that the defendant had lied about communicating with the victim on the phone, that he hadn't last spoke to her on the day of the abortion, that in fact his number had been saved in the victim's phone under a woman's name, and they had most recently had contact. They knew from the victim's brothers that the victim had been seeing somebody else and been betraying the defendant. In the past two days they said they had spoken to a lot of people and done their homework, and that is clearly borne out by their testimony. One of the victim's friends had told the police that the victim said that she had risked her life by aborting the defendant's baby and he would be angry about it. Witnesses had told the police that during an argument with the victim, the defendant had previously grabbed her hair, threatened her, and locked her in an apartment. They said that they would check the victim's cell phone to determine whether or not the defendant was lying about his most recent contact with her. They found additional, you know, there's just a little avalanche of things in there. Lastly, regarding any and effective assistance to counsel claims, we would be relying on the arguments set forth in our brief, but I would like to note that counsel raised a brand new issue today for the first time, that counsel should have elicited that somehow the police officers had lied about the defendant not having a car. Of course, there's absolutely no evidence of that whatsoever. It was clearly the defendant who lied when he told Officer Kirby he didn't have a car and he needed to come and pick him up. And, of course, it comes out later that he has his truck and he fixed the stereo and it was right behind the defendant's apartment. So this case, we have more than met our burden regarding the existence and waiver of Miranda rights, the proximity and time regarding the arrest and statement, the many intervening circumstances in this case, and the fact that there is absolutely zero evidence of police misconduct in this case. And for all of the reasons that have been argued here today and those in our brief, the people respectfully request that this court affirm the trial court's attenuation finding. Thank you. May I have a rebuttal? Thank you, Your Honors. I just want to address two things. As far as Miranda goes, I really would just like to watch the video. The statement counsel read where Miranda says yes, okay. It relates to the fourth question. You can see it in the transcript and the video. And really the thing both of us agree on is to watch his body language. It is very clear that he is uncertain about his rights. As far as intervening circumstances, absolutely nothing the State talked about today is independent of the illegal arrest. An intervening circumstance must be independent of the illegality. The State talks about a holster. Police got that information from Hernandez by asking him where his truck is. Then they went and got his truck and found a holster in it and confronted him with it. That's not a valid intervening circumstance. People be frank in the Supreme Court has said an intervening circumstance must be independent of the illegality. Same with the receipt. Same with the alibi. And same with the GSR test. Also, all of those things rely upon a rule that is also addressed in Franklin that the State cannot now bring those up. So really the only conceivable argument they have is that this fake GSR test that they admit is a ruse aimed at eliciting a confession is an intervening circumstance. That's obviously an exploitation of the illegal arrest. They cannot give him this fake GSR test without asking him. And that's really all there is to this. It's the State's burden and the State has not proven any fact that attenuates this statement from the illegal arrest. Both parties agree that the law of the case applies. Certainly if this court is considering revisiting the issue of the legality of arrest, it should be litigated in the circuit court first. Thank you, Your Honors. We'd like to reverse the circuit court's finding and remand for further proceedings. Thank you. I would like to comment that the arguments that were presented today were terrific on both sides. They couldn't be any better. Two of the best arguments I've heard in many, many years. And as we said in the previous case that Justice Lamkin couldn't be here today, but she will listen to the tape and she will be part of our decision-making process. We'll take this case under advisement. The court is adjourned.